AARON J. MOSS (190625)
aaron.moss@msk.com
JOSHUA M. GELLER (295412)
josh.geller@msk.com
ARIANA T. ADDO-YOBO (363119)
ata@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

HARRISON A. NEWMAN (*Pro Hac Vice*)
han@msk.com
MITCHELL SILBERBERG & KNUPP LLP
437 Madison Ave., 25th Floor
New York, New York 10022-7001
Telephone: (212) 509-3900
Facsimile: (212) 509-7239

Attorneys for Plaintiffs
SPYDER GAMES LLC and
SPEEDY SIMULATOR GAMING, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

SPYDER GAMES LLC, a Louisiana limited liability company; and SPEEDY SIMULATOR GAMING, LLC, a Wyoming limited liability company,

Plaintiffs and Counter-Defendants,

v.

MEMENTUM LAB, a French company,

Defendant and Counterclaimant.

CASE NO. 5:25-CV-10248-NW

**PLAINTIFFS AND COUNTER-DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS MEMENTUM LAB'S SECOND AMENDED COUNTERCLAIMS PURSUANT TO FRCP 12(B)(6)**

Hon. Noël Wise

Date: September 23, 2026
Time: 9:00 a.m.
Courtroom: 3

[*Filed concurrently with Declaration of Janzen Madsen and [Proposed] Order*]

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on September 23, 2026 at 9:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 3 of the above-entitled Court, located at 280 South First Street, 5th Floor, San Jose, CA 95112, Plaintiffs and Counter-Defendants Spyder Games LLC and Speedy Simulator Gaming, LLC (collectively, "Plaintiffs") will, and hereby do, move to dismiss the Second Amended Counterclaim filed by Counterclaimant Mementum Lab ("Mementum") for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). In particular, Mementum's claims for trademark infringement fail because: (1) Mementum does not allege that it has a valid trademark—it does not allege that consumers would understand the character of Tung Tung Sahur to function as a source identifier, and it engaged in uncontrolled, naked licensing; (2) Mementum's claims are barred by *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), because Mementum is asserting a claim over the origin and authorship of creative content (i.e., the creation of the character Tung Tung Sahur); (3) Mementum does not plausibly allege that consumers are likely to be confused by Plaintiffs' alleged use of the character; and (4) Mementum does not have priority of use of Tung Tung Sahur over Plaintiffs.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently filed Declaration of Janzen Madsen, any reply papers that may be filed, and on such further oral or documentary evidence as may be presented at or before the hearing on this matter.

DATED: AUGUST 19, 2026

MITCHELL SILBERBERG & KNUPP LLP

By: [signature]

Aaron J. Moss
Joshua M. Geller
Ariana T. Addo-Yobo
Attorneys for Plaintiffs
SPYDER GAMES LLC and
SPEEDY SIMULATOR GAMING, LLC

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 9

II. FACTUAL BACKGROUND ........ 10

A. The Brainrot Genre and the Tung Tung Sahur Character ........ 10

B. Plaintiffs Create a Video Game Depicting the Viral Brainrot Memes. ........ 11

C. Mementum Licenses Tung Tung Sahur from Noxa, and then Licenses It to Other Third Parties. ........ 12

D. Mementum's Cease-and-Desist Letter and the Course of This Litigation. ........ 13

III. ARGUMENT ........ 14

A. Mementum Has Not Plausibly Alleged a Valid, Protectable Trademark. ........ 15

1. Tung Tung Sahur is a Fictional Character, Not a Source Identifier. ........ 16

2. Mementum Engaged in Naked Licensing. ........ 20

B. The Counterclaims are Independently Barred by *Dastar*. ........ 22

C. Mementum Has Not Plausibly Alleged Likelihood of Confusion. ........ 26

D. Even if the Parties Were Using Tung Tung Sahur as a Source Identifier, Plaintiffs Would Have Priority of Use, Not Mementum. ........ 29

IV. CONCLUSION ........ 31

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AMF Inc. v. Sleekcraft Boats*,
599 F.2d 341 (9th Cir. 1979) ............ 28

*Applied Info. Scis. Corp. v. eBay, Inc.*,
511 F.3d 966 (9th Cir. 2007) ............ 15, 26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............ 22, 26

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
457 F.3d 1062 (9th Cir. 2006) ............ 18

*Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*,
289 F.3d 589 (9th Cir. 2002) ............ 20, 22, 30

*Bastiat USA, Inc. v. Shein Distrib. Corp.*,
No. 2:25-CV-05701-ODW, 2026 WL 1146737 (C.D. Cal. Apr. 28, 2026) ............ 24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............ 26

*Brantley v. Epic Games, Inc.*,
463 F. Supp. 3d 616 (D. Md. 2020) ............ 24

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
174 F.3d 1036 (9th Cir. 1999) ............ 16

*Buti v. Perosa, S.R.L.*,
139 F.3d 98 (2d Cir. 1998) ............ 30

*Carter v. Helmsley-Spear, Inc.*,
71 F.3d 77 (2d Cir. 1995) ............ 22

*Carter v. Oath Holdings Inc.*,
No. 17-CV-07086-KAW, 2018 WL 5819458 (N.D. Cal. Nov. 5, 2018), *aff'd*, 788 F. App'x 436 (9th Cir. 2019) ............ 26

*Century 21 Real Estate Corp. v. Sandlin*,
846 F.2d 1175 (9th Cir. 1988) ............ 15

*Cleary v. News Corp.*,
30 F.3d 1255 (9th Cir. 1994) ............ 15

*Coach, Inc. v. Citi Trends, Inc.*,
No. CV 17-4775 DMG (KSX), 2019 WL 6354367 (C.D. Cal. Oct. 23, 2019) ............ 19

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Comedy III Prods., Inc. v. New Line Cinema*,
200 F.3d 593 (9th Cir. 2000) .......... 16, 23

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003) .......... 9, 10, 14, 15, 22, 23, 24, 25

*Davis v. Blige*,
505 F.3d 90 (2d Cir. 2007) .......... 22, 30

*Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*,
448 F.3d 1118 (9th Cir. 2006) .......... 20, 21

*Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*,
458 F.3d 931 (9th Cir. 2006) .......... 17

*Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*,
778 F.3d 1059 (9th Cir. 2015) .......... 27, 28

*Foremost Groups Inc. v. Ayers Bath USA Corp.*,
No. CV 11-07473 GAF (EX), 2012 WL 13012450 (C.D. Cal. 2012) .......... 20

*Grupo Gigante SA De CV v. Dallo & Co.*,
391 F.3d 1088 (9th Cir. 2004) .......... 30

*Halo Mgmt., LLC v. Interland, Inc.*,
2004 WL 1781013 (N.D. Cal. Aug. 10, 2004) .......... 22

*Hara v. Netflix, Inc.*,
146 F.4th 872 (9th Cir. 2025) .......... 18

*In re Caserta*,
46 U.S.P.Q.2d 1088, 1998 WL 148715 (TTAB 1998) .......... 19

*In re GO & Assocs., LLC*,
90 F.4th 1354 (Fed. Cir. 2024) .......... 18

*In re Hechinger Inv. Co. of Delaware Inc.*,
24 U.S.P.Q.2d 1053, 1991 WL 403182 (TTAB 1991) .......... 19

*In re McDonald's Corp.*,
229 U.S.P.Q. 555, 1985 WL 72057 (TTAB 1985) .......... 19

*In re Scholastic Inc.*,
223 U.S.P.Q. 431, 1984 WL 63575 (TTAB 1984) .......... 19

**TABLE OF AUTHORITIES**
**(continued)**


**Page(s)**

*In re Stallard*,
No. 97115036, 2023 WL 5607600 (TTAB Aug. 28, 2023) ........ 19

*Infostream Grp. Inc. v. Avid Life Media Inc.*,
No. CV 12-09315 DDP, 2013 WL 6018030 (C.D. Cal. Nov. 12, 2013) ........ 26

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*,
599 U.S. 140 (2023) ........ 14, 18

*Johnson v. Meta Platforms, Inc.*,
No. 22-CV-05691-BLF, 2023 WL 5021784 (N.D. Cal. Aug. 4, 2023) ........ 27

*King v. Perry*,
No. CV 24-2650 PA, 2024 WL 7009936 (C.D. Cal. June 24, 2024), *aff'd*, No. 24-4841, 2026 WL 734783 (9th Cir. Mar. 16, 2026) ........ 24

*Lerner & Rowe PC v. Brown Engstrand & Shely LLC*,
119 F.4th 711 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2732 (2025) ........ 28

*Lions Gate Ent. Inc. v. TD Ameritrade Servs. Co.*,
170 F. Supp. 3d 1249 (C.D. Cal. 2016) ........ 24

*Lost Int'l, LLC v. Germanotta*,
2025 WL 4058219 (C.D. Cal. Dec. 15, 2025) ........ 19

*Motul S.A. v. USA Wholesale Lubricant, Inc.*,
686 F. Supp. 3d 900 (N.D. Cal. 2023) ........ 26, 29

*Orgain, Inc. v. N. Innovations Holding Corp.*,
No. 8:18-CV-01253-JLS-ADS, 2018 WL 7504409 (C.D. Cal. Dec. 6, 2018) ........ 20

*Pait Sols. LLC v. Dejant Grp.*,
No. 2:24-CV-08666-RGK-PVC, 2025 WL 1717990 (C.D. Cal. Apr. 29, 2025) ........ 27

*Parrino v. FHP, Inc.*,
146 F.3d 699 (9th Cir. 1998) ........ 21

*Pellegrino v. Epic Games, Inc.*,
451 F. Supp. 3d 373 (E.D. Pa. 2020) ........ 24

*Performance Designed Prods. LLC v. Plantronics, Inc.*,
No. 3:19-CV-00536-GPC-LL, 2019 WL 3082160 (S.D. Cal. July 15, 2019) ........ 27

*Person's Co. v. Christman*,
900 F.2d 1565 (Fed. Cir. 1990) ........ 16

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Rearden LLC v. Rearden Com., Inc.*,
683 F.3d 1190 (9th Cir. 2012)....................16, 26

*Rogozinski v. Reddit, Inc.*,
No. 24-735, 2025 WL 1650019 (9th Cir. June 11, 2025) (unpublished), *cert. denied*, 146 S. Ct. 892 (2025)....................31

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
59 F.3d 902 (9th Cir. 1995)....................17

*Sengoku Works Ltd. v. RMC Int'l, Ltd.*,
96 F.3d 1217 (9th Cir.), *as modified*, 97 F.3d 1460 (9th Cir. 1996)....................29

*Slep-Tone Entertainment Corp. v. Wired for Sound Karaoke & DJ Services, LLC*,
845 F.3d 1246 (9th Cir. 2017)....................23, 28

*Soc. Techs. LLC v. Apple Inc.*,
4 F.4th 811 (9th Cir. 2021)....................29

*Sybersound Records, Inc. v. UAV Corp.*,
517 F.3d 1137 (9th Cir. 2008)....................25

*Theta Chi Fraternity, Inc. v. Leland Stanford Junior Univ.*,
212 F. Supp. 3d 816 (N.D. Cal. 2016)....................26

*United States v. Able Time, Inc.*,
545 F.3d 824 (9th Cir. 2008)....................17

*Vericool World, LLC v. Igloo Prods. Corp.*,
175 F.4th 1045 (9th Cir. 2026)....................25, 26

*Warren v. Fox Fam. Worldwide, Inc.*,
171 F. Supp. 2d 1057 (C.D. Cal. 2001), *aff'd*, 328 F.3d 1136 (9th Cir. 2003)....................21

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*,
419 F.3d 925 (9th Cir. 2005)....................15, 16

**STATUTES**

15 U.S.C.
§ 1055....................20, 29, 30
§ 1125(a)....................14, 15, 23
§ 1126....................15
§ 1126(i)....................14
§ 1126(h)....................14
§ 1127....................29

# TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

**OTHER AUTHORITIES**

Dogan & Lemley, The Merchandising Right: Fragile Theory or Fait Accompli?, 54 Emory L.J. 461, 488 (2005) .......... 28

## I. INTRODUCTION

Tung Tung Sahur is a fictional “brainrot” character—part of a genre of absurd, surrealist internet memes that went viral in early 2025. The character was posted online by an Indonesian content creator known as “Noxa.” Mementum Lab (“Mementum”), a French startup that describes itself as “a talent agency for the creators of brainrot characters,” claims to be Noxa’s representative and licensee. Mementum has inserted itself as the commercial gatekeeper for Tung Tung Sahur and dozens of other brainrot characters, asserting the exclusive right to control—and collect royalties from—anyone who depicts these viral memes in video games and other works.

Mementum’s Second Amended Counterclaim (the “Counterclaim”) alleges that Plaintiffs depicted Tung Tung Sahur in their Roblox video game *Steal a Brainrot* without authorization. That is a dispute over who controls the right to reproduce and distribute a piece of creative content (the character of Tung Tung Sahur) and is the province of copyright law. However, Mementum has chosen not to assert a copyright claim, likely because the character was generated by AI tools without sufficient human authorship to qualify for copyright protection. It has instead recast the same theory as trademark infringement. But trademark law serves a different purpose than copyright: it protects consumers from confusion about the source of a good or service. Mementum does not allege that any consumer believes *Steal a Brainrot* is produced by Mementum. Rather, it alleges only that consumers might assume Plaintiffs’ depiction “must have been” authorized. That assumption concerns who holds the legal right to use the content—the domain of copyright. These are not trademark claims.

The Supreme Court drew this line in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), holding that trademark law protects against confusion over the producer of tangible goods, not confusion over the origin of creative content embodied in those goods. The Ninth Circuit has enforced that boundary repeatedly. Mementum’s counterclaims fall squarely on the wrong side of it.

This is Mementum’s third counterclaim pleading—but as with the previous ones, it fails for at least four independent reasons, each of which is sufficient to require dismissal. First, Mementum has not plausibly alleged ownership of a valid trademark. The Counterclaim does not

plead facts plausibly showing that Tung Tung Sahur functions as a source identifier, and Mementum cannot claim a valid trademark when it engaged in uncontrolled, naked licensing. Second, Mementum's claims are barred by *Dastar* because they seek to extend trademark protection to the depiction of expressive content within a creative work. Third, Mementum's allegations of consumer confusion are conclusory, declaring without any plausible factual basis that consumers would be confused about whether Plaintiffs' use of the character was authorized. Fourth, Mementum cannot establish priority of use over Plaintiffs because it had no controlled U.S. use of Tung Tung Sahur that predates Plaintiffs' depiction of the character in *Steal a Brainrot*. Any one of these defects defeats Mementum's Counterclaim.

## II. <u>FACTUAL BACKGROUND</u>

### A. <u>The Brainrot Genre and the Tung Tung Sahur Character</u>

"Brainrot" characters are "a genre of absurd, surrealist characters born from content creators that became wildly popular with Gen Alpha starting in early 2025." Countercl. ¶ 1 (Dkt. No. 51). Individual creators "invented a universe of such characters, typically by combining objects, animals and human features." *Id.*

The character at the center of this dispute, Tung Tung Sahur, was created by an Indonesian content creator known as "Noxa." *Id.* ¶ 3. The Counterclaim describes the character's genesis in detail. Noxa "sought to create a character that captured the Indonesian tradition and collective memory of being woken up for Sahur," a pre-fast meal during Ramadan. *Id.* He chose the name "Tung Tung Sahur" to evoke the sound that kentongans (slit drums) make when struck during the nighttime call to Sahur. *Id.* He then "created the backstory for Tung Tung Sahur—a supernatural guardian resembling a kentongan who is friendly but strange, funny yet disturbing, and firm about Sahur, carrying a wooden bat to wake people for the pre-fast meal." *Id.* Noxa subsequently created the character's visual depiction—"a humanoid kentongan carrying a wooden bat"—and "used editing software to make further changes, including to carefully synchronize the character with the voiceover … and music." *Id.*

Noxa posted his video depicting Tung Tung Sahur on TikTok on February 28, 2025. *Id.* ¶ 4. The character "went viral, with the video quickly generating tens of millions of views, millions

of likes, and a substantial number of comments and bookmarks." *Id.* Mementum alleges that "[b]y May 2025, Tung Tung Sahur had become a famous, iconic character, including in the United States," and that media coverage detailed "Noxa's creation of the character, its backstory and popularity." *Id.*

**B. <u>Plaintiffs Create a Video Game Depicting the Viral Brainrot Memes.</u>**

On or around May 16, 2025, Plaintiffs released *Steal a Brainrot*, a video game on the Roblox platform through which users "steal" brainrot characters as they traverse the Game. Countercl. ¶ 6. Tung Tung Sahur was one of many brainrot characters depicted in the Game. *Id.* ¶ 7. He appears in the game with the name Tung Tung Tung Sahur and is depicted as a blocky, rectangular, low-resolution figure with a generic smiling face. *Id.* The Game "quickly became one of the most popular video games in the world, surpassing 20 million peak concurrent users in late






2025, garnering over 56 billion visits by early 2026, and generating tens of millions of dollars in revenue." *Id.* ¶ 8.

### C. <u>Mementum Licenses Tung Tung Sahur from Noxa, and then Licenses It to Other Third Parties.</u>

Mementum is a French startup that describes itself as "effectively a talent agency for the creators of brainrot characters." Countercl. ¶ 9. Mementum did not create Tung Tung Sahur. Rather, it alleges that it "acquired from Noxa and Breno the exclusive worldwide rights to many of their brainrot characters," that it is those creators' "exclusive representative," and that it owns trademark rights in Tung Tung Sahur "by virtue of acquiring such exclusive, worldwide rights through a licensing agreement it entered into with Noxa." *Id.* ¶¶ 9, 30.

After licensing Tung Tung Sahur from its creator, Mementum obtained a registered trademark in France (INPI Registration No. FR5157809) and an international registration with WIPO (Registration No. 1913096) for the name and image of Tung Tung Sahur. *Id.* ¶ 9. Mementum does not allege that it holds any U.S. trademark registration.




Mementum alleges that "Noxa and its exclusive representative Defendant" have used the name and image of Tung Tung Sahur in commerce. *Id.* ¶ 16(g). The Counterclaim identifies the following alleged commercial uses of the character:

- *First*, "[o]n or around April 22, 2025, Noxa and a principal of Defendant launched a 'hackathon' on the 'dev.fun' platform in which developers built games using the name and image of the Tung Tung Sahur character and the $SAHUR token

(cryptocurrency based on the character), with developers receiving cash prizes." *Id.* ¶ 16(a). There were "approximately 26 submissions and $2,000 in cash prizes," and the winning game, *Whack-a-Tung*, allegedly "used the name and image of Tung Tung Sahur with Noxa's consent." *Id.*

- *Second*, a "worldwide license *retroactive* to May 1, 2025" authorizing use of Tung Tung Sahur in the video game *Tung Tung Tung Sahur*, released on or around May 5, 2025. *Id* ¶ 16(b) (emphasis added).
- *Third*, a worldwide license entered "[o]n or around October 11, 2025" for the Roblox game *Plants Vs Brainrots*. *Id.* ¶ 16(c). Plaintiffs obtained a copy of that license from the game's developer and file it herewith. Declaration of Janzen Madsen ("Madsen Decl.") ¶¶ 1–3 & Ex. A.
- *Fourth*, a license entered "[o]n or around December 8, 2025" for the mobile game *Pudgy Party* "in the United States and other approved territories." *Id.* ¶ 16(d).
- *Fifth*, a worldwide license entered "[o]n or around January 14, 2026" with Epic Games for the use of Tung Tung Sahur in *Fortnite*, with skins launching on or around April 4, 2026. *Id.* ¶ 16(e).
- *Sixth*, a worldwide license entered "[o]n or around April 16, 2026" for the video game *Brainrot Fight*. *Id.* ¶ 16(f).

Each of these games depicts Tung Tung Sahur's "name and likeness" within the game, each in a different visual style and different appearance details. *Id.* ¶¶ 16(a)–(f).

**D. <u>Mementum's Cease-and-Desist Letter and the Course of This Litigation.</u>**

On September 3, 2025, Mementum sent Plaintiffs a cease-and-desist letter asserting "intellectual property rights in Tung Tung Sahur." Countercl. ¶ 10. After receiving the letter, Plaintiffs initially removed Tung Tung Sahur from the Game. *Id.* ¶ 11. When the parties were unable to reach a negotiated resolution, Plaintiffs put Tung Tung Sahur back in the Game. *Id.* ¶

13.[1]

On November 26, 2025, Plaintiffs commenced this action, seeking a declaration that Mementum does not own any valid or enforceable copyright rights in Tung Tung Sahur or the other brainrot characters it has licensed, including because these characters were generated by artificial intelligence without sufficient human authorship. On April 24, 2026, Mementum filed counterclaims, declining to assert a claim for copyright infringement and instead asserting claims for trademark infringement under the Lanham Act (15 U.S.C. § 1125(a)), unfair competition under the Lanham Act (15 U.S.C. § 1126(h) and (i)), and common law unfair competition under California law. Plaintiffs moved to dismiss, and Mementum amended in lieu of opposing. Dkt. No. 25. Plaintiffs moved to dismiss again. That motion was fully briefed, and on July 30, 2026, Mementum filed the SACC pursuant to the Court's order allowing the parties to amend their pleadings. Dkt. No. 51.

## III. ARGUMENT

Trademark law protects consumers from confusion about the source of goods and services. *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 147 (2023) ("Confusion as to source is the bête noire of trademark law."). Trademarks "tell[] the public who is responsible for a product" or service. *Id.* at 146. Mementum's counterclaims have nothing to do with consumer confusion about the source of goods or services. No party to this dispute is using Tung Tung Sahur to identify the source of goods and services to consumers. Tung Tung Sahur is a fictional character generated by Noxa, who licensed rights to Mementum, which has in turn licensed those rights to other companies. The character is not a brand name, a logo, or any other type of source identifier. *See id.* ("a trademark is not a trademark unless it identifies a *product's* source [] and distinguishes that source from others"). This is a dispute about allegedly unauthorized use of creative content—a copyright concern—repackaged in trademark language. *See Dastar*, 539 U.S. at 34 (the Lanham Act cannot be used to create "a species of mutant copyright law").

[1] Plaintiffs have since again removed Tung Tung Sahur from the Game pending resolution of this dispute, after Mementum's French counsel submitted a takedown request under the European Union's Digital Services Act to Roblox in Europe. Countercl. ¶ 14.

To state a trademark infringement claim—whether brought under Section 43(a) of the Lanham Act, Section 44, or California common law—Mementum must plead facts plausibly establishing (1) ownership of a valid, protectable trademark, and (2) that Plaintiffs' use of the mark is likely to cause consumer confusion. *Applied Info. Scis. Corp. v. eBay, Inc.*, 511 F.3d 966, 969 (9th Cir. 2007) (citing *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1053 (9th Cir. 1999)). Mementum's three counterclaims rise or fall together. "The 'ultimate test' for unfair competition is exactly the same as for trademark infringement: 'whether the public is likely to be deceived or confused by the similarity of the marks.'" *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988) (citing *New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979)); *see Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) (unfair competition claims are "substantially congruent" to Lanham Act claims).

The Counterclaim fails for four independent reasons, any one of which requires dismissal. First, Mementum has not plausibly alleged that it owns a valid, protectable trademark; it does not use Tung Tung Sahur as a source identifier and it has engaged in naked licensing of Tung Tung Sahur. Second, the counterclaims are independently barred by *Dastar*: even assuming a valid mark, the Lanham Act does not reach claims grounded in the unauthorized depiction of creative content within an expressive work. Third, Mementum has not plausibly alleged likelihood of confusion. Fourth, even if the parties had been engaged in a trademark use of Tung Tung Sahur, Mementum has not pleaded priority of use over Plaintiffs.

### A. <u>**Mementum Has Not Plausibly Alleged a Valid, Protectable Trademark.**</u>

A threshold element of any Lanham Act trademark claim is ownership of a valid, protectable mark. *Applied Info. Scis.*, 511 F.3d at 969–70. Where, as here, the claimant holds no U.S. registration, it bears the full burden of pleading and proving validity. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005). Mementum has not done so for two independent reasons: Tung Tung Sahur does not function as a source identifier, and Mementum engaged in naked licensing of Tung Tung Sahur.

1. Tung Tung Sahur is a Fictional Character, Not a Source Identifier.

The Lanham Act "grants trademark protection only to marks that are used to identify and to distinguish goods or services in commerce—which typically occurs when a mark is used in conjunction with the actual sale of goods or services." *Brookfield Commc'ns*, 174 F.3d at 1051. A designation that has not been used "in public in a manner that creates an association among consumers between the mark and the mark's owner" does not qualify. *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1204 (9th Cir. 2012). For an unregistered mark, the question is whether "the public recognizes [the claimant's] symbol as identifying [its] goods or services and distinguishing them from those of others."[2] *Comedy III Prods., Inc. v. New Line Cinema*, 200 F.3d 593, 594–95 (9th Cir. 2000). Mementum must therefore allege sufficient facts to state a plausible claim that Tung Tung Sahur operates as a symbol distinguishing Mementum's goods or services from those of others. *Yellow Cab*, 419 F.3d at 927.

Mementum's own allegations establish that Tung Tung Sahur is nothing more than a fictional character who propagated freely as a meme on the internet—without any connection to a particular brand. According to Mementum, the character originated when "Noxa sought to create a character that captured the Indonesian tradition and collective memory of being woken up for Sahur." Countercl. ¶ 3. The Counterclaim describes the character's "backstory," his personality ("friendly but strange, funny yet disturbing, and firm about Sahur"), and the "involved, artistic process" through which Noxa developed his name, appearance, and voice. *Id.* ¶¶ 2–5.

Mementum then alleges that Tung Tung Sahur went viral after Noxa posted the February 28, 2025 video and became "a famous, iconic character, including in the United States" by May 2025. Countercl. ¶ 4. Noxa (and Mementum after him) did not start commercially exploiting Tung Tung Sahur until after the character had already become "famous." Apart from a one-day

[2] Mementum's foreign trademark registrations do not diminish that burden. Trademark law is territorial and "foreign use has no effect on U.S. commerce" and "trademark rights exist in each country solely according to that country's statutory scheme." *Person's Co. v. Christman*, 900 F.2d 1565, 1568–69 (Fed. Cir. 1990). Absent a U.S. registration, Mementum receives no presumption of validity, no presumption of ownership, and no presumption of an exclusive right to use the mark. *Yellow Cab*, 419 F.3d at 928.

hackathon (*id.* ¶ 16(a)), the first supposedly "authorized" exploitation pleaded is a bare consent Noxa gave on May 5, 2025 for a single mobile game—a license granted "retroactive[ly]," after the game had already been released on or about May 5, 2025. *Id.* ¶ 16(b). Plaintiffs, meanwhile, released their Game, with its depiction of Tung Tung Sahur, on May 16, 2025. *Id.* ¶ 6. The Counterclaim alleges no further licensed use by Mementum until October 2025; *Fortnite* followed in 2026. *Id.* ¶¶ 16(c)–(f). This sequence of events leads to only one possible inference: Tung Tung Sahur became known to consumers as a viral meme character, owned by no one in particular.

Rather than confront this chronology, Mementum tries to blur the distinction between a fictional character and a brand identifier by repeatedly alleging that Tung Tung Sahur is popular and well-known. *E.g.,* Countercl. ¶ 29(b) ("The name 'Tung Tung Sahur' and the image of Tung Tung Sahur identify a character that is one of the most popular online."). Tung Tung Sahur may have been famous as of May 2025—at least, within the segment of the public that might be familiar with "Brainrot" memes—but he could not have been famous as an identifier of any particular goods or services when he was not even being commercially exploited. "Implicit in the concept of a trade mark 'is a requirement that there be direct association between the mark . . . and the services specified in the application, i.e. that it be used in such a manner that it would be readily perceived as identifying such services.'" *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 906–07 (9th Cir. 1995) (citation omitted). "[T]rademarks are tied to their use on products and do not exist in the abstract. . . . [It is] a 'right appurtenant to an established business or trade in connection with which the mark is employed,' not a 'right in gross or at large.'" *United States v. Able Time, Inc.*, 545 F.3d 824, 835 (9th Cir. 2008) (quoting *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918)); *Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 939 (9th Cir. 2006) ("Trademark use does indeed require an existing business . . . .").

It was only after Tung Tung Sahur became a famous meme that Mementum tried to insert itself as the character's "commercial gatekeeper"—a term Mementum uses throughout its Counterclaim. Countercl. ¶¶ 20, 32(b). But asserting the rights to control the exploitation of a fictional character does not transform that character into a trademark. A trademark "tells the public

who is responsible for a product." *Jack Daniel's*, 599 U.S. at 146. It "assures a potential customer that this item . . . is made by the same producer as other similarly marked products." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1067 (9th Cir. 2006); *see In re GO & Assocs., LLC*, 90 F.4th 1354, 1356 (Fed. Cir. 2024) ("[W]hether a proposed mark is a source identifier . . . [depends] on . . . how it is perceived by consumers.").

Mementum treats its commercial exploitation of the character as if it is self-executing—as though the act of licensing Tung Tung Sahur to third parties itself establishes that the character is a trademark. *See, e.g.*, Countercl. ¶ 17 (asserting that Mementum's "consistent, expansive and active commercial licensing history" and "quality control over these licensed uses" render the character's name and image "source identifiers that distinguish goods and services authorized by Noxa and/or Defendant from those that are not."). But these private licensing arrangements with third-party gaming companies say nothing whatsoever about how consumers perceive the character. The Counterclaim contains no allegation that anything a consumer actually encounters—whether in the games or in advertising for them—presents Tung Tung Sahur as authorized or sponsored, connects one appearance to another, or gives a consumer reason to believe a single entity stands behind these uses. To the contrary, the images depicting the purportedly licensed uses all show Tung Tung Sahur appearing within various video games rendered in different visual styles by different developers—as a character that players encounter during gameplay. *Id.* ¶¶ 16(a)–(f); *see id.* ¶ 16(b) ("Play as Tung Tung Tung Sahur in an epic prison break story"); ¶ 16(d) ("Tung Tung Sahur is back in Pudgy Party as a special collection . . . Three exclusive costumes."). All that the public sees is a fictional character appearing in video games. The SACC's new assertion that Tung Tung Sahur's name and image are "affixed to and/or used in connection with video games and other products . . . to sell other video games and products" (SACC ¶ 18) does not change this analysis. First, the allegation is wholly conclusory, identifying no product on which the character's name or image appears as a brand or mark. And to the extent the allegation describes the use of a popular character to promote and market the games in which it appears, that is promotional activity "auxiliary" to the expressive work. *See Hara v. Netflix, Inc.*, 146 F.4th 872, 882 (9th Cir. 2025) ("promotional activities, even those that produce revenue, are auxiliary to the work itself");

*Lost Int'l, LLC v. Germanotta*, 2025 WL 4058219, at *4 (C.D. Cal. Dec. 15, 2025) (revenue-generating sale of promotional consumer merchandise bearing the challenged mark auxiliary to the expressive work). While a character may become a trademark over time through consistent exploitation and branding, that happens only when the public comes to perceive the character as a mark. The Trademark Trial and Appeal Board has consistently held that designations identifying a character in a creative work do not automatically function as trademarks, and its analysis is persuasive here. *See Coach, Inc. v. Citi Trends, Inc.*, No. CV 17-4775 DMG (KSX), 2019 WL 6354367, at *10 (C.D. Cal. Oct. 23, 2019) (citing "TTAB's registration analysis" as "persuasive" authority). A character's use "must be perceived by the purchasing public not just as a character but also as a mark which identifies and distinguishes the source of the goods or services." *In re Hechinger Inv. Co. of Delaware Inc.*, 24 U.S.P.Q.2d 1053, 1991 WL 403182, at *3 (TTAB 1991). "[D]esignations that merely identify a character in a creative work are not registrable, whether the character appears in a series or in a single work." *In re Stallard*, No. 97115036, 2023 WL 5607600, at *2 (TTAB Aug. 28, 2023). The TTAB has applied this principle to refuse registration where a character name appeared on the cover and every page of a children's book, *In re Caserta*, 46 U.S.P.Q.2d 1088, 1998 WL 148715, at *2–3 (TTAB 1998); where it identified main characters in a book series, *In re Scholastic Inc.*, 223 U.S.P.Q. 431, 1984 WL 63575, at *1–2 (TTAB 1984); and where a character name identified one character in a procession of characters, *In re McDonald's Corp.*, 229 U.S.P.Q. 555, 1985 WL 72057, at *1–2 (TTAB 1985). The principle applies with particular force in the video game context: in *Stallard*, the TTAB affirmed the refusal to register a video game character as a trademark, holding that "[v]ideo game characters are not per se registrable without a showing that they function as marks" and that the character at issue was "merely associated with one character in the game, and it is not used in a way to identify and distinguish the source of the game itself." 2023 WL 5607600, at *5–6. In this context, Tung Tung Sahur *is* the product (a character to be exploited in a video game); he is not a signifier of some other goods or services.

Without factual allegations that consumers actually associate Tung Tung Sahur with a single source of goods and services, Mementum cannot satisfy the first element of its trademark

infringement claims. *See Foremost Groups Inc. v. Ayers Bath USA Corp.*, No. CV 11-07473 GAF (EX), 2012 WL 13012450, at *9 (C.D. Cal. 2012) (granting motion to dismiss where there were "no facts alleged . . . to suggest that actual consumers associate the label . . . with [Plaintiff] or with any single source"); *Orgain, Inc. v. N. Innovations Holding Corp.*, No. 8:18-CV-01253-JLS-ADS, 2018 WL 7504409, at *4–5 (C.D. Cal. Dec. 6, 2018) (granting motion to dismiss for failure to "plausibly alleg[e] distinctiveness").

2. <u>Mementum Engaged in Naked Licensing.</u>

Mementum does not allege that it has ever itself sold a good or service under Tung Tung Sahur in the United States. Mementum's claim to a U.S. trademark is entirely derivative, based on the related company doctrine, 15 U.S.C. § 1055. *Id.* ¶ 31. But the related-company doctrine allows a licensor to piggyback on a licensee's use of a mark only if the licensor controls the quality of the goods and services sold under the mark. 15 U.S.C. § 1055; *Barcamerica Int'l USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d 589, 595–96 (9th Cir. 2002). Control is required because a mark assures the public that goods sold under it are "consistent and predictable" in quality; a trademark owner who licenses its mark without controlling quality engages in "naked licensing" and "forfeit[s] its rights in the mark." *Id.* at 596, 598. Even a single "naked license" is enough to effectuate a forfeiture, because such licensing is "inherently deceptive." *Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1131 (9th Cir. 2006) (quoting *Barcamerica*, 289 F.3d at 598). To rely on its licensees' uses, then, Mementum must plausibly allege that it controlled the quality of those uses. But Mementum's naked licensing forecloses that theory.

Mementum alleges that it licensed Tung Tung Sahur to the makers of the video game *Plants Vs Brainrots* (the "PvB License"). It describes an "October 11, 2025 . . . worldwide license authorizing the use of Tung Tung Sahur," in which Mementum "included a depiction of the name and image of Tung Tung Sahur in the license to help ensure the character would be properly depicted," and for which Mementum received "payment." *Id.* ¶ 16(c).

A "district court ruling on a motion to dismiss may consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [] pleading.'" *Parrino v. FHP, Inc.*, 146 F.3d 699, 705 (9th Cir. 1998) (quoting

*Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)). Under the incorporation-by-reference doctrine, courts can consider documents "crucial to the [] claims, but not explicitly incorporated in [the pleading]" to effectuate the "policy concern" of preventing the pleading party from "deliberately omitting references to documents upon which their claims are based." *Id.* at 706; *see also Warren v. Fox Fam. Worldwide, Inc.*, 171 F. Supp. 2d 1057, 1064 (C.D. Cal. 2001) (considering documents referenced in a complaint on a Rule 12 motion), *aff'd*, 328 F.3d 1136 (9th Cir. 2003). Plaintiffs obtained a copy of the PvB License from the developer of *Plants Vs Brainrots* and file it concurrently with this Motion. *See* Declaration of Janzen Madsen, Ex. A.

On its face, the agreement is a one-year, royalty-free license granted in exchange for nothing but a single lump-sum payment of €25,000, in full and final settlement of "any and all prior . . . use" of a "fictional character" the licensee's game was *already* exploiting. Madsen Decl., Ex. A §§ 2.1, 2.3, 3.1. The agreement never uses the word "trademark" at all, but simply includes a depiction of the Tung Tung Sahur image that Mementum claims as its trademark. It recites that Mementum holds "the proprietary rights over an original fictional character" and licenses the right to "use, reproduce, represent, adapt, and integrate" that character into a single video game—the vocabulary of copyright. *Id.* Recitals & § 2.1; *see infra*, Part III.B. Its royalty-free structure leaves Mementum no continuing economic stake in the licensee's goods, a strong indicator that an arrangement is not a controlled trademark license. *Bazaar Del Mundo*, 448 F.3d at 1130 (finding a naked license where "[n]one of the terms typical of a trademark licensing agreement, such as payment of royalties, are present").

The license does not reserve Mementum any right to control the quality of the licensee's game or its depiction of the character. It provides for no inspection, no approval, no quality specifications, and specifically states that the licensee "shall be permitted to edit/modify the Character to the extent necessary to integrate in the Game in a manner stylistically consistent with the Game." Ex. A, § 2.1. The one provision addressed to the manner of the licensee's use is a moral-rights clause: the licensee must use the character "in a manner consistent with the moral rights of the original author" and may not "distort or misrepresent the Character" without Mementum's consent. Ex. A § 4.2. Moral rights are personal to the author (here, the content

creator Noxa); they do not belong to Mementum. *See Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 81 (2d Cir. 1995) (moral rights are "of a spiritual, non-economic and personal nature" and protect the "artist's personality" embodied in the work). Regardless, the license places no "distinct or cognizable restriction on the quality of goods." *Halo Mgmt., LLC v. Interland, Inc.*, 2004 WL 1781013, at *4 (N.D. Cal. Aug. 10, 2004) (holding a license "naked" "[b]y its own terms" despite the licensee's obligation to use "reasonable commercial efforts to maintain the positive business value" of the mark).

Nor can Mementum argue that it exercises any control over the exploitation in practice. On its face, the license states that it settles "any and all ***prior*** … use" of the character, which the licensee's game was already exploiting. Ex. A §§ 2.1, 3.1. A licensor that settles a use after the fact did not control the quality of that use as it was made. The settlement is therefore evidence that no contemporaneous control existed. *See Davis v. Blige*, 505 F.3d 90, 103 (2d Cir. 2007) ("A retroactive license or assignment purports to authorize a past use that was originally unauthorized."). Measured against the license it describes, Mementum's allegation that it "exercises quality control over each licensee's use" is a legal conclusion the license refutes. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

Because the PvB License is quintessentially a "naked license"—a retroactive settlement allowing royalty-free exploitation with no quality control—Mementum has abandoned any claim to trademark rights, and its claims fail as a matter of law. *Barcamerica*, 289 F.3d at 596, 598.

### B. The Counterclaims are Independently Barred by *Dastar*.

Even if Mementum could allege that it has a valid trademark in Tung Tung Sahur, its trademark claims would be independently barred by *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003). *Dastar* polices the boundary between trademark and copyright law. When a claimant seeks to exercise rights in expressive content (as Mementum is doing with the character of Tung Tung Sahur as depicted in a video game), those claims sound exclusively in copyright, not trademark. Mementum has made a strategic decision not to pursue copyright claims in this action. But it cannot use trademark law as an end-run around defects in those copyright claims when this dispute fundamentally involves the alleged copying of expressive content.

In *Dastar*, Twentieth Century Fox brought a Lanham Act claim alleging that Dastar copied and repackaged a television series for which Fox held distribution rights, marketing the result as Dastar's own product. 539 U.S. at 25–27, 31. Fox claimed that this was actionable infringement as a "false designation of origin" under § 43(a) of the Lanham Act. *Id.* at 31 (citing 15 U.S.C. § 1125(a)(1)(A)). The Supreme Court rejected the theory, holding that "origin of goods" under the Lanham Act "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Id.* at 37. The contrary reading, the Court explained, "would be akin to finding that § 43(a) created a species of perpetual patent and copyright, which Congress may not do." *Id.* (citing *Eldred v. Ashcroft*, 537 U.S. 186, 208 (2003)). *Dastar* therefore draws a bright line between trademark claims alleging confusion as to "the producer of the tangible product sold in the marketplace," and claims alleging confusion as to who "originated the ideas or communications that 'goods' embody or contain." *Id.* at 31–32.

The Ninth Circuit applied that distinction directly in *Slep-Tone Entertainment Corp. v. Wired for Sound Karaoke & DJ Services, LLC*, 845 F.3d 1246 (9th Cir. 2017), affirming dismissal of a karaoke track producer's infringement claim against an operator that displayed unauthorized copies of its tracks. "[T]he 'good' whose 'origin' is material for purposes of a trademark infringement claim is the 'tangible product sold in the marketplace' rather than the creative content of that product." *Id.* at 1250 (citation omitted). And the court foreclosed any argument that the doctrine depends on the label affixed to the claim: "[w]hether we call the violation infringement, unfair competition or false designation of origin, the test is identical . . . ." *Id.* at 1249. The Ninth Circuit reached the same result in *Comedy III Productions, Inc. v. New Line Cinema*, 200 F.3d 593 (9th Cir. 2000) where the plaintiff sued a film studio for using a clip from a public domain Three Stooges film, conceding it had no copyright claim but arguing the clip contained protectable trademarks—the Stooges' "name, voices, images, and act." *Id.* at 595. The court affirmed dismissal, holding that "the Lanham Act cannot be used to circumvent copyright law." *Id.* at 595–96.

District courts apply these principles routinely, including in cases involving video games. In *Pellegrino v. Epic Games, Inc.*, 451 F. Supp. 3d 373 (E.D. Pa. 2020), a musician sued Epic for

incorporating his signature dance move into the video game *Fortnite* as a purchasable "emote," alleging false designation of origin under the Lanham Act. The court dismissed the claim, holding that the dance move was "the creative idea underlying Epic's tangible good, the [] emote [for sale in the game]," and that any confusion concerned "who originated the Signature Move embodied in the [] emote"—precisely the type of origin-of-content claim *Dastar* forecloses. *Id.* at 385; *see also Brantley v. Epic Games, Inc.*, 463 F. Supp. 3d 616, 628–29 (D. Md. 2020) (dismissing Lanham Act claims where plaintiffs alleged Epic Games copied their dance into a *Fortnite* video game emote, holding that the allegations "pertain to copying ideas or concepts" governed by copyright); *Lions Gate Ent. Inc. v. TD Ameritrade Servs. Co.*, 170 F. Supp. 3d 1249, 1266–68 (C.D. Cal. 2016) (dismissing trademark claims where bank used the line "Nobody puts Baby in a corner" and other elements from *Dirty Dancing* in advertisements, holding that the allegedly appropriated content fell within the domain of copyright); *Bastiat USA, Inc. v. Shein Distrib. Corp.*, No. 2:25-CV-05701-ODW, 2026 WL 1146737, at *3–4 (C.D. Cal. Apr. 28, 2026) (dismissing trademark claims where defendant copied photographs containing the plaintiff's trademark because the gravamen of the claims was "unauthorized copying and use of creative works"); *King v. Perry*, No. CV 24-2650 PA, 2024 WL 7009936, at *6 (C.D. Cal. June 24, 2024), *aff'd*, No. 24-4841, 2026 WL 734783 (9th Cir. Mar. 16, 2026) (dismissing trademark claims where gravamen of the claims fell "within the scope of the Copyright Act").

The "tangible product sold in the marketplace" here is *Steal a Brainrot*—a Roblox game developed and offered by Plaintiffs. Countercl. ¶¶ 6, 8. Mementum does not allege facts suggesting that consumers are confused about who produces *Steal a Brainrot*.[3] The Counterclaim attempts to sidestep this point by adding the allegation that consumers were also confused about "whether the Game itself was sponsored by, affiliated with, or approved by Noxa and/or Defendant." Countercl. ¶ 32. But the only basis for inferring Game-level sponsorship confusion is

[3] Indeed, Mementum notes in a footnote that there was "widespread public outcry" when Tung Tung Sahur was removed from the Game as a result of Mementum's cease-and-desist letter, and that this was "publicly attributed to a licensing dispute"—underscoring the fact that the public understands that *Steal a Brainrot* is not produced by the company that claims to hold the rights to Tung Tung Sahur. *See* Countercl. ¶ 11 n.2.

the presence of the character within the Game, which brings the theory right back to content-origin confusion. Countercl. ¶ 32 ("Plaintiffs have used Tung Tung Sahur's name and image without Defendant's permission in connection with the Game in a manner that was likely to cause confusion"); *see also id.* ¶ 40 (same).

The Ninth Circuit rejected this exact theory in *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008), applying *Dastar* even though the claimed confusion was about licensing—whether someone had the right to use creative content or not—and not exclusively about who originated the content. In *Sybersound*, a karaoke producer alleged its competitors had misrepresented their records as properly licensed; the Ninth Circuit affirmed dismissal, holding that construing the Lanham Act to reach "misrepresentations about copyright licensing status . . . would allow competitors . . . to litigate the underlying copyright infringement when they have no standing to do so." *Id.* at 1143–44. Here, a consumer's (mistaken) belief that Plaintiffs' use of the character Tung Tung Sahur was "authorized" or "licensed" is a belief about licensing status, which the Lanham Act does not police. Mementum's allegation that "consumers who encountered the name and image of Tung Tung Sahur in the Game believed that [such use] was authorized, sponsored or licensed by Noxa and/or Defendant in their capacity as the commercial gatekeepers for Tung Tung Sahur," is thus immaterial to the *Dastar* analysis. Countercl. ¶ 32. Consumer confusion about whether a fictional character was legitimately licensed or not cannot turn an ordinary copyright licensing dispute into a trademark claim. *See, e.g.*, *Vericool World, LLC v. Igloo Prods. Corp.*, 175 F.4th 1045, 1055 (9th Cir. 2026) ("If [a] misrepresentation regards 'matters that are typically of no consequence to purchasers,' such as the source of the idea, design, or innovation embodied in the product, then plaintiffs must bring an intellectual property claim and cannot proceed under the Lanham Act.").

Stripped of its trademark labels, the Counterclaim alleges that Plaintiffs placed a fictional character's "name and likeness" inside their video game without permission (Countercl. ¶ 7) and thereby "appropriate[d] Defendant's intellectual property" (*id.* ¶ 34). The Counterclaim details the "involved, artistic process" through which Tung Tung Sahur was created, including the origin of its name, backstory, voice, visual design, and accompanying music. *Id.* ¶¶ 2–5. This is a claim of

authorship over creative content, which is the domain of copyright, not trademark. The Lanham Act provides no remedy. *Vericool World*, 175 F.4th at 1055 ("[C]ourts must 'avoid overlap between the Lanham and Copyright Acts' when interpreting the terms of the Lanham Act.").

**C. <u>Mementum Has Not Plausibly Alleged Likelihood of Confusion.</u>**

Mementum's Counterclaim fails for the independent reason that Mementum has not plausibly alleged that Plaintiffs' use of the mark is likely to cause consumer confusion—the second required element of a trademark infringement claim. *Applied Info. Scis.*, 511 F.3d at 969. The likelihood of confusion inquiry asks "whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of the goods or services bearing one of the marks." *Rearden*, 683 F.3d at 1209. To survive a motion to dismiss, a claimant must plead factual allegations sufficient to make that confusion plausible—bare legal conclusions will not do. *Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"Courts may determine likelihood of confusion as a matter of law on either a motion to dismiss or summary judgment." *Infostream Grp. Inc. v. Avid Life Media Inc.*, No. CV 12-09315 DDP (AJWx), 2013 WL 6018030, at *3 (C.D. Cal. Nov. 12, 2013) (citing *Murray v. Cable Nat'l Broad. Co.*, 86 F.3d 858, 860–61 (9th Cir. 1996)). Courts in this Circuit routinely do so where the allegations are conclusory. *See, e.g.*, *Motul S.A. v. USA Wholesale Lubricant, Inc.*, 686 F. Supp. 3d 900, 915 (N.D. Cal. 2023) (granting motion to dismiss for failure to plausibly allege likelihood of confusion even though "Motul's mark and Defendants' alleged use of the mark are identical in sight, sound, and meaning" and "it is undisputed that the parties use the 'MOTUL' mark in connection with the same services"); *Carter v. Oath Holdings Inc.*, No. 17-CV-07086-KAW, 2018 WL 5819458, at *5 (N.D. Cal. Nov. 5, 2018) (granting motion to dismiss where plaintiff offered "only conclusory statements that the counterfeit marks 'deceive and mislead consumers' and 'create likelihood of confusion among consumers'"), *aff'd*, 788 F. App'x 436 (9th Cir. 2019); *Theta Chi Fraternity, Inc. v. Leland Stanford Junior Univ.*, 212 F. Supp. 3d 816, 824–25 (N.D. Cal. 2016) (granting motion to dismiss where plaintiff failed to allege "any facts demonstrating that any member of the public" had been confused); *Johnson v. Meta Platforms, Inc.*, No. 22-CV-05691-BLF, 2023 WL 5021784, at *6 (N.D. Cal. Aug. 4, 2023) (granting motion to dismiss where

plaintiff did "not allege facts supporting her conclusory allegation that Instagram users are confused by the third party marks"); *Pait Sols. LLC v. Dejant Grp.*, No. 2:24-CV-08666-RGK-PVC, 2025 WL 1717990, at *3 (C.D. Cal. Apr. 29, 2025) (granting motion to dismiss where plaintiff failed to "plead facts to plausibly demonstrate that Defendants' advertisement confused or deceived consumers about the origin or source" of the product); *Performance Designed Prods. LLC v. Plantronics, Inc.*, No. 3:19-CV-00536-GPC-LL, 2019 WL 3082160, at *5 (S.D. Cal. July 15, 2019) (dismissing where plaintiff "provided insufficient facts to plausibly state an allegation that the public is likely to be confused").

The Counterclaim attempts to hide its lack of factual allegations behind volume. Paragraph 32 runs almost a page and announces "many indicia supporting that there was a likelihood of confusion." Countercl. ¶ 32. But each "indicium" restates the same legal conclusion: that consumers who encountered Tung Tung Sahur in the Game would believe the character was being used with permission. Mementum's theory reduces to the proposition that because Tung Tung Sahur appears in *Fortnite* and other games under license, consumers would expect the character to be licensed in *Steal a Brainrot* too. The theory is implausible on its face, given that the bulk of Mementum's licensing of Tung Tung Sahur ***postdated*** Plaintiffs' depiction of the character in the Game: Mementum licensed *Plants Vs Brainrots* on October 11, 2025; *Pudgy Party* on December 8, 2025; and *Fortnite* on January 14, 2026, with the Tung Tung Sahur skins launching on April 4, 2026. *Id.* ¶¶ 16(c)–(e). The idea that a consumer would be confused when interacting with Tung Tung Sahur in Plaintiffs' Game, thinking it was "similar to the skins in *Fortnite*"—merchandise that launched eleven months after the Game began depicting Tung Tung Sahur—is not a plausible allegation. *Id.* ¶ 32(a). But even if consumers did have an expectation about licensing status, that is not the type of confusion that is actionable under the Lanham Act. *See supra* Part III.B.

As Judge Christen observed in *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A.*, Inc., a consumer's "common lay legal opinion" that a rights holder "must have" authorized a use "does nothing to suggest that the use … runs afoul of the purpose of the Lanham Act" absent evidence that the confusion "could have had an impact on the consumers' purchasing decisions." 778 F.3d 1059, 1084–85 (9th Cir. 2015) (Christen, J., concurring in part); *see also* Dogan & Lemley, The

Merchandising Right: Fragile Theory or Fait Accompli?, 54 Emory L.J. 461, 488 (2005) ("If individuals don't 'care one way or the other whether the [trademark holder] sponsors or endorses such products or whether the products are officially licensed,' then the competitive process certainly does not suffer from their assumption that the use required a license.") (citations omitted). The Ninth Circuit's holding in *Slep-Tone* reinforces the point: a consumer's belief about who authorized the content within a product is confusion "over the source of content," not over "the source of the tangible good sold in the marketplace." 845 F.3d at 1249–50. Mementum alleges no facts suggesting that any consumer's decision to play or spend money in *Steal a Brainrot* was influenced by a belief about whether Tung Tung Sahur's appearance in the Game was authorized by Mementum.

The Counterclaim does not identify a single instance of actual confusion; it does not allege any misdirected customer inquiry, nor even any social media posts or any other factual indicator that any consumer believed *Steal a Brainrot* was produced by, affiliated with, or endorsed by Mementum or its licensees. This is a significant omission given that Mementum alleges that Noxa's video of Tung Tung Sahur garnered tens of millions of views on social media, and given that *Steal a Brainrot* has tens of millions of users. Countercl. ¶¶ 4, 8. If there were any likelihood of confusion in the marketplace, Mementum should be able to surface *some* factual allegation to that effect from among those millions of interactions. *Cf. Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F.4th 711, 719–21 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2732 (2025) (finding no triable question of fact where the evidence of actual confusion "236 [misdirected] calls" was de minimis compared to the "109,322 consumers who saw the advertisements").

As discussed above, Mementum's allegations about the strength and fame of the trademark center on Tung Tung Sahur's popularity as a meme character, rather than a brand identifier; and Mementum alleges nothing about the degree of care exercised by consumers of Roblox games, the marketing channels through which the parties reach consumers, or any other factual matter bearing on the *Sleekcraft* analysis. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). The sum total of Mementum's allegations is that (1) Plaintiffs are using Tung Tung Sahur, and (2) both Plaintiffs and many of Mementum's licensees operate in the video game space.

Courts have dismissed trademark claims on allegations considerably stronger than these. *E.g.*, *Motul*, 686 F. Supp. 3d at 914–15 (dismissing even though the marks were "identical in sight, sound, and meaning" and the parties sold the same product because the plaintiff still failed to plead sufficient facts making confusion plausible).

### D. Even if the Parties Were Using Tung Tung Sahur as a Source Identifier, Plaintiffs Would Have Priority of Use, Not Mementum.

While Tung Tung Sahur should not be treated as a trademark in the first place, if it were, Mementum's claim would independently fail for lack of priority. Establishing ownership of a valid, protectable mark also requires pleading "priority of use"—i.e., that the claimant was actually using the mark in commerce prior to the allegedly infringing use. *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir.), *as modified*, 97 F.3d 1460 (9th Cir. 1996). Mementum's own chronology forecloses priority on the face of the Counterclaim.

As explained above, Mementum's sole theory of U.S. priority is that licensee uses inure to its benefit under § 1055. Countercl. ¶ 31. The operative question is therefore whether Mementum licensed Tung Tung Sahur to a U.S. licensee and exercised quality control over that licensee before Plaintiffs' use of Tung Tung Sahur in *Steal a Brainrot. See supra* Part III.A.

Mementum alleges that Plaintiffs began depicting Tung Tung Sahur in *Steal a Brainrot* on May 16, 2025. Countercl. ¶ 6. Of the uses alleged in the Counterclaim, only two are alleged to predate that date: the April 22, 2025 "hackathon" (*id.* ¶ 16(a)) and the Tung Tung Tung Sahur mobile game (*id.* ¶ 16(b)). Neither establishes priority.

First, the "hackathon" was not a "bona fide use of a mark in the ordinary course of trade" and so does not establish priority of use. 15 U.S.C. § 1127. A commercial use must be sufficiently public to create an "association among consumers between the mark and the mark's owner." *Soc. Techs. LLC v. Apple Inc.*, 4 F.4th 811, 819–20 (9th Cir. 2021) (citation omitted). A one-day contest on a cryptocurrency platform—"approximately 26 submissions and $2,000 in cash prizes" (Countercl. ¶ 16(a))—is token use of the most literal kind. *See Soc. Techs.*, 4 F.4th at 821 (no trademark rights where use was "token use for the purposes of reserving … trademark rights"). Nor does the Counterclaim allege that the hackathon reached United States consumers at all.

"[P]riority of trademark rights in the United States depends solely upon priority of use in the United States, not on priority of use anywhere in the world." *Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1093 (9th Cir. 2004); *see Buti v. Perosa, S.R.L.*, 139 F.3d 98, 103 (2d Cir. 1998) (promotional activities in the United States "insufficient to establish 'use in commerce'" absent proof that the foreign business offered services in U.S. commerce). And an open contest in which independent developers built their own games for cash prizes is the opposite of controlled use: Mementum does not allege that anyone exercised quality control over 26 independent hackathon entries, nor that Mementum or Noxa commercially exploited them in any way. *Barcamerica*, 289 F.3d at 595–96. This "hackathon" is not a bona fide use of a mark in commerce.

That leaves the *Tung Tung Tung Sahur* game as the sole potential hook for priority in the United States. On the face of the pleading, the only authorization in place when that game was released was Noxa's consent, given on May 5, 2025 in response to a request the developer made the day before. Countercl. ¶ 16(b). A bare consent is not a controlled trademark license.

The SACC now adds that "Noxa and Defendant reviewed and approved the character's visual depiction, name, and manner of use." *Id.* That allegation sits alongside the chronology in the same paragraph: a developer built the game independently, asked for consent on May 4, and received it on May 5 for a game that was finished and released "on or around that date." *Id.* Review and approval of a character's "visual depiction, name, and manner of use" in a completed game the licensor learned of the day before is not control over the nature and quality of the goods, which is what § 1055 requires. And Mementum's own license came later and was "retroactive to May 1, 2025." *Id.* (emphasis added). It is impossible to have exercised quality control over a use not yet authorized. *Davis v. Blige,* 505 F.3d at 103. The retroactive license may have later blessed the earlier use, which is not the same as controlling that use when it occurred.

Because no use predating May 16, 2025 was made under Mementum's control, the earliest license the SACC pleads for a game distributed in the United States is the October 11, 2025 license for *Plants Vs Brainrots*, five months after Plaintiffs had already been using the Tung Tung Sahur name and character in their own Roblox game. SACC ¶ 16(c). And that license, as discussed above, confers nothing either. *See supra* Part III.A.2.

The Ninth Circuit's recent unpublished decision in *Rogozinski v. Reddit, Inc.* is instructive. There, the court affirmed dismissal of trademark claims over the name "WallStreetBets," holding that even a party who created and popularized a designation within someone else's product cannot claim trademark ownership when a third party is the one actually providing the goods or services. No. 24-735, 2025 WL 1650019, at *1 (9th Cir. June 11, 2025) (unpublished), *cert. denied*, 146 S. Ct. 892 (2025). The court emphasized that "[t]o acquire ownership of a trademark[,] it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Id.* (quoting *Hana Fin., Inc. v. Hana Bank*, 735 F.3d 1158, 1163 (9th Cir. 2013)). Even though Rogozinski played a "prominent role" in building the WallStreetBets community, the Ninth Circuit held he had not stated a valid ownership claim because it was Reddit—the platform provider—that "created and provided the services" to consumers. *Id.* Mementum's posture is analogous: it is a content licensor whose role is to supply a popular character for inclusion in third-party video games. That is not "use in the sale of goods or services" sufficient to establish priority trademark rights. *See id.*

## IV. CONCLUSION

Mementum has already attempted to re-plead its trademark counterclaims twice. It has again failed to state a claim for relief. For all of the foregoing reasons, Plaintiffs respectfully request that the Court dismiss Mementum's Counterclaim with prejudice.

DATED: AUGUST 19, 2026

MITCHELL SILBERBERG & KNUPP LLP

By: [signature]

Aaron J. Moss
Joshua M. Geller
Ariana T. Addo-Yobo
Attorneys for Plaintiffs
SPYDER GAMES LLC and
SPEEDY SIMULATOR GAMING, LLC